William R. FORMAN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 15324.

United States Court of Appeals Ninth Circuit.

Sept. 15, 1958.

Opinion Modified on Denial of Rehearing Oct. 27, 1958.

See 261 F.2d 181.

George W. Mead, S. J. Bischoff, Portland, Or., for appellant.

Charles P. Moriarty, U. S. Atty., Seattle, Wash., John S. Obenour, Jr., Asst.

U. S. Atty., Tacoma, Wash., for appellee.

Before HEALY, POPE and FEE, Circuit Judges.

POPE, Circuit Judge.

Appellant Forman was found guilty and sentenced under the fifteenth count of a fifteen count indictment returned against him and one Seijas. The first fourteen counts of the indictment stated charges against Seijas only, and they are not involved in this appeal. In the fifteenth count it was charged that Seijas and Forman entered into a conspiracy to defraud the United States and to violate certain sections of the Internal Revenue Code and the Criminal Code, among them section 145(b) of the Internal Revenue Code (1939),[1] relating to attempts to evade or defeat income tax. As the case is presented here the key portions of this count were stated in paragraphs "C" and "D", as follows:

"C. To violate Section 145(b) of the Internal Revenue Code, 26 U.S.C., Section 145(b), by knowingly and willfully attempting to defraud and evade a large portion of the income taxes owed by Armador A. Seijas and his wife, Betty L. Seijas, and others to the United States for the years 1942 to 1945, inclusive, upon their share of the unreported income of the afore-mentioned partnerships.

"D. To violate Section 1001 of the New Criminal Code, 18 U.S.C., Section 1001, and Section 145(b) of the Internal Revenue Code, 26 U.S.C., Section 145(b), by furnishing officers and employees of the Treasury Department false books and records, and false financial state-

[1] "(b) Failure to collect and pay over tax, or attempt to defeat or evade tax. Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution." At the trial the violation of sections other than this one were removed from consideration of the jury as a basis of conspiracy.

ments, and by making false statements to such officers and employees for the purpose of concealing from the Treasury Department their share of the unreported income of the aforesaid partnerships, and for the purpose of concealing from the Treasury Department the true income tax liability of Armador A. Seijas and his wife, Betty L. Seijas, for the years 1942 to 1945, inclusive."

The count listed 33 overt acts alleged to have been committed in furtherance of the conspiracy.

Seijas in a separate trial was found guilty, under counts 9 through 13, of substantive offenses pertaining to the evasion or attempt to evade his tax and that of his wife for the years 1946 through 1948. He pleaded guilty to the charge against him in count 15. Forman was tried alone upon that count and Seijas, who was then serving his sentence under the other counts, was produced as a witness for the Government.

The evidence tended to show that during the years 1941–1945, inclusive, Seijas and Forman, as partners, were conducting the business of operating pinball machines in Kitsap County, Washington; that they carried on this business under an arrangement whereby the pinball machines were placed in taverns and other locations; that the coins in the machines were collected by employees of the partnership and the amounts so taken would be divided equally between the partnership and the proprietor of the pinball location; that instead of accounting for all of the collections made, the collectors by direction of the partners held out a portion of the actual amounts collected and turned over to the partnership bookkeeper for entry in the partnership books only a portion of the actual collections; that in this manner some $172,400 was held out of the pinball receipts during the years 1942 through 1945; that this amount was neither reported to the location owners nor entered in the partnership books, nor reflected in the income tax returns,—it was split between Forman and Seijas neither of whom reported any part of these sums upon his own tax returns.

■ Forman's participation in the setting up of this arrangement and in the handling of the partnership books and the making of the partnership information returns, so as to conceal the receipt of these funds during the years 1942 to 1945, was proven by credible evidence, and there was abundant proof of Forman's participation in a conspiracy such as that described in paragraph C quoted above, namely, one to defraud and evade Seijas' income taxes for the years 1942 through 1945.

The outcome of this case, however, does not turn upon any such question since the court instructed the jury that a conspiracy to commit the offenses referred to in paragraphs C and D of the indictment, insofar as they were for the purpose of evading the tax liability of Seijas and wife, were subject to a six year period of limitation, and prosecution must be commenced within six years of the last overt act in furtherance of such conspiracy. The court stated to the jury:

"I charge you that the conspiracy to evade the tax liability of defendant Seijas and his wife, if any there be, was consummated upon the filing of the individual tax returns of Seijas and his wife for the year 1945 which was filed in March, 1946, and the statute of limitations would run from that time." The indictment was filed November 19, 1953.

However, as bearing upon that portion of the indictment, quoted above as paragraph D, and relating to a conspiracy to violate section 145(b) of the Internal Revenue Code, "by furnishing false books and records and making false statements, for the purpose of concealing * * * their share of the unreported income * * * and for the purpose of concealing * * * the true income tax liability" of Seijas and his wife, the court charged the jury as follows: "If you find that the defendant Seijas and Forman conspired to attempt to evade the tax liability of Seijas and his wife

and others for the years 1942 to 1945, inclusive, you must find the defendant Forman not guilty unless you are convinced beyond a reasonable doubt that they also conspired to conceal the alleged conspiracy in order to prevent prosecution therefor and that such additional conspiracy was a continuing one. You cannot imply that there was a continuing conspiracy to conceal the offense from the fact that they may have conspired to attempt to evade the tax liability of Seijas and wife. That is to say, the mere fact that they may have conspired to evade the tax liability of Seijas and his wife for the years in question, if it be a fact, does not warrant the conclusion that they also conspired to conceal the commission of the offense. You would have to be convinced beyond a reasonable doubt that they actually conspired to conceal the conspiracy and that they committed an overt act or acts in furtherance of such subsidiary conspiracy. As previously stated, the understanding or agreement for such conspiracy need not have been entered into by written or formal oral expression, but may be determined from a consideration of the conduct and statements of the parties and all of the evidence as shown by the evidence in the case." [2] It will thus be noted that the jury were told that it was not sufficient merely to prove conspiracy to attempt to evade tax liability of Seijas and wife from 1942 to 1945, inclusive, but that the jury must be convinced beyond a reasonable doubt that they also conspired to conceal the conspiracy to evade the tax liability in order to prevent prosecution thereof and that such additional conspiracy was a continuing one.

The court further made this point very clear by concluding its charge in respect to these matters as follows:

"Summarizing with respect to the statute of limitations, you must first find that Forman knowingly and wilfully conspired with Seijas to attempt to evade the tax liability of Seijas, Mrs. Seijas and others;

"Second, that part of this conspiracy was to make continuing efforts to avoid detection and prosecution under the condition just referred to;

"Third, that one or more of the alleged conspirators committed an overt act or acts within a period of six years prior to the filing of the indictment herein in furtherance of the conspiracy and during its continuance to accomplish the object of the conspiracy just referred to; namely, attempted evasion of tax liability of Seijas, Mrs. Seijas and others.

"If you cannot answer all three of these questions in the affirmative, as shown by the evidence beyond a reasonable doubt, then you must return a verdict of not guilty."

Appellant argues that the court should have granted his motions for judgment of acquittal, contending that there was not sufficient evidence to establish: "(a) a conspiracy between defendant and Seijas to evade Seijas' tax liability; and (b) a subsidiary conspiracy to conceal the aforesaid conspiracy."

As above indicated, we think the proof of the conspiracy to evade Seijas' tax liability was entirely adequate and so strong as to be almost overwhelming. Actually, as their collector testified, they "stole" from the machines. They were

---

2. This was followed by the following portion of the charge which contains the part previously quoted: "If you find that the defendants only conspired to attempt to evade the tax liability of defendant Seijas and his wife and did not form the additional conspiracy to conceal the same, then I charge you that the conspiracy to evade the tax liability of defendant Seijas and his wife, if any there be, was consummated upon the filing of the individual tax returns of Seijas and his wife for the year 1945 which was filed in March, 1946, and the statutes of limitations would run from that time, and if you so find, your verdict would have to be not guilty.

"If you find that there was no subsidiary conspiracy to conceal as I have just outlined it to you, but acts of concealment were thereafter committed as an after-thought and were conceived after the filing of the returns in March, 1946, then, of course, your verdict must be for the defendant Forman."

engaged in perpetrating a fraud upon the location operators who were supposed to receive half of the proceeds. They sent false reports to their own bookkeeper as to the partnership gross receipts. This led to the false partnership returns and the evasion of the taxes owing by Seijas.

Clear as this evidence of their guilt of a conspiracy to evade Seijas' taxes is, it is not the important part of this suit in view of the fact that this portion of the conspiracy was consummated, as the court told the jury, on the filing of Seijas' tax returns in March, 1946. As the court's instructions stated, if this is all there was to the conspiracy, the statute of limitations would run from that time and the prosecution would be barred.

As to the contention that there was no evidence to prove that there was a subsidiary conspiracy to conceal, or to prove that the conspiracy itself included the actual conspiracy to accomplish not only the evasion of the taxes but the concealment of that evasion, appellant leans heavily upon the testimony given by defense witnesses that Forman ceased all participation in the pinball machine operations and in his association with Seijas in that business about August 8, 1946. At that time Forman sold his one-half interest in the pinball machine partnership business to one Morin and written agreements were executed evidencing the assignment by Forman of 49% of his interest to Morin and 1% to Seijas. At the same time Seijas and Morin adopted the articles of copartnership formerly executed between Forman and Seijas which recited that Morin was accepted as a partner by Seijas instead of Forman. There was also evidence to indicate that the "hold out" practices previously carried on between Seijas and Forman ceased and terminated about that time.

The Government claimed on the other hand that notwithstanding the execution of these instruments, Forman remained a secret partner in respect to Seijas' interest in the pinball business. Thus it was shown that half of $30,000 received from Morin for sale of Forman's interest to him was paid over to Seijas who testified that it was agreed that Forman was to have a secret one-half interest in Seijas' 51% of the Seijas-Morin partnership.[3] Appellant contends that he has established by "overwhelming" evidence that the payment of the $15,000 was a loan from Forman to Seijas and not a division of the purchase price paid by Morin.

 Wholly apart from this dispute as to whether Forman did or did not continue to hold a secret interest in the pinball business, we think there was adequate proof, although circumstantial in character, of the Government's contention that there was an actual subsidiary conspiracy to conceal.

The whole common enterprise from beginning to end was marked by efforts of concealment. When the parties first opened up their business in Kitsap County they concealed their part in it by having the licenses to operate the machines issued in the names of other persons. These persons were employed simply to lend their names. The licenses were taken in the names of United Amusement Company and Bremerton Amusement Company, which were the names under which Seijas and Forman were then doing business. During this period Seijas and Forman undertook other enterprises and in connection with those their actual activities were concealed by subterfuge and misrepresentations. They acquired an enterprise known as "Dock Concessions", put friends in charge to operate it with percentage interests to them, and made provisions that Forman was to be a silent partner. At the same time Seijas had a silent one-half interest in Forman's silent one-half interest. Seijas bought out some inter-

---

**3.** This testimony was confirmed by a written agreement, dated August 9, 1946, signed by Seijas and Forman, reciting that "W. R. Forman is the owner and partner of the remaining 51% in equal shares with Army Seijas."

ests of one Heberling in three other pinball routes and Forman and Seijas had a secret agreement that they each had equal interests in the routes purchased. Seijas divided what he collected with Forman and this continued after September 1, 1946, when the sale to Morin became operative.

In 1950 internal revenue agents began an investigation of Seijas, and between that date and the time when the indictment was returned on November 19, 1953, both Seijas and Forman gave numerous false statements to the agents denying any unreported income from the 1942–1945 pinball operations. Typical of this sort of thing was the conduct of Forman listed in overt act No. 29 of the indictment as follows:

"On or about September 1, 1948, in Seattle, Washington, William R. Forman concealed from an officer and employee of the Treasury Department of the United States engaged in an official re-examination of his and his wife's personal income tax returns for the year 1945 that during that year he received income from the afore-mentioned partnerships with Armador A. Seijas in addition to the amounts shown on the information returns filed by said partnerships."

In an audit of the February 28, 1947 return, Seijas and Forman gave the internal revenue agent the books and records of the partnership for 1944–1945 representing that they showed all the receipts for those years. They concealed the holdout pinball income. The same thing was done with another investigating agent in 1948 who received the first partnership records. These transactions are listed among the overt acts specified in the indictment. Throughout the periods here mentioned Seijas and Forman occupied the same office space and they were associated together in various theatre enterprises. Up to the time of the indictment and even through the trial Forman and Seijas continued to conceal the interest which Forman had in the Seijas-Morin partnership.

The theory of the Government was plainly that which had been recently accepted and approved in United States v. Grunewald, 2 Cir., 233 F.2d 556, 565. There the court said: "The record contains ample proof of efforts by the conspirators to forestall suspicion and wipe out traces of their operations and these efforts developed later and in 1951 and 1952 into an intensified campaign of concealment." The court then proceeded to distinguish the cases of Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790, and Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L. Ed. 593, and concluded: "In the case before us now it was charged in the indictment that one of the terms of the illegal agreement was that continuing efforts would be made 'to avoid detection and prosecution by any governmental body' and much of the proof adduced at the trial was admitted in support of this charge. The jury were instructed that no such term of the agreement could be implied but that they must make a finding based upon the evidence before them, and that if the efforts to conceal were 'no more than an afterthought' they must find defendants not guilty. In Lutwak, despite the fact that the indictment charged an agreement to conceal, there was no evidence to support it. The clear implication is that, if the allegation had been supported by evidence, the court would have arrived at a different conclusion, for it is stated in the opinion, 344 U.S. at page 616, 73 S.Ct. at page 488: 'But there is no statement in the indictment of a single overt act of concealment that was committed after December 5, 1947 and no substantial evidence of any. Such acts as were set forth and proved were acts that revealed and did not conceal the fraud.' Here the record is replete with evidence of acts of concealment."

Here, also as in the Grunewald case, the record is replete with evidence of acts of concealment, acts participated in by both Forman and Seijas and circumstantial evidence that one of the terms of the illegal agreement was that continuing efforts would be made to avoid detection and prosecution through conceal-

ment and false representations to the investigating officers.

As the case was presented to the trial judge, (the trial began July 30, 1956 and the verdict was returned August 15, thereafter), the Grunewald case had but recently been concluded in the court of appeals. The language we have just quoted contains quotations from the Lutwak case which convinced the Second Circuit that the Government's theory was a tenable one. In the Krulewitch case the language of the court would appear to lend color to what the Government contended in the Grunewald case, namely, that in Krulewitch the court was simply refusing to accept a contention that in case of any conspiracy there is an implied agreement and understanding that the conspirators will continue to conceal what they have done. The court said: "We are not persuaded to adopt the Government's implicit conspiracy theory which in all criminal conspiracy cases would create automatically a further breach of the general rule against the admissions of hearsay evidence."[4]

However, we possess an advantage here that the trial court did not have. After the court below was required to rule upon these questions, and to frame its instructions to the jury, the decision of the court of appeals in the Grunewald case was reversed in Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 970, 1 L.Ed.2d 931. There the Supreme Court dealt with two contentions of the Government as to why the Grunewald conviction should be sustained. The second alternative contention, which does not concern us here, was held by the court to present a legal theory which the court found "unexceptional"; but the first of those contentions presented precisely the same theory upon which the present case was submitted to the jury which returned the verdict against Forman. This the Supreme Court rejected, holding that notwithstanding the subsidiary conspiracy may have arisen from an *actual* agreement to conceal, which was established by circumstantial evidence, and not a mere *implied* conspiracy to conceal *implied* from the fact that the main conspiracy was kept secret, yet the period of the statute of limitations was not extended by reason of the agreement to conceal being included as a subsidiary element or part of the original conspiracy. The court set forth this portion of the Government's theory as follows: "First, it urges that even if the main object of the conspiracy was to obtain decisions from the Bureau of Internal Revenue not to institute criminal tax prosecutions—decisions obtained in 1948 and 1949—the indictment alleged, and the proofs showed, that the conspiracy also included as a subsidiary element an agreement to conceal the conspiracy to 'fix' these tax cases, to the end that the conspirators would escape detection and punishment for their crime. Says the Government, 'from the very nature of the conspiracy * * * there had to be, and was, from the outset a conscious, deliberate, agreement to conceal * * * each and every aspect of the conspiracy * * *.' It is then argued that since the alleged conspiracy to conceal clearly continued long after the main criminal purpose of the conspiracy was accomplished, and since overt acts in furtherance of the agreement to conceal were performed well within the indictment period, the prosecution was timely."

That contention the court rejected. It said: "Sanctioning the Government's theory would for all practical purposes wipe out the statute of limitations in

---

4. See, also, the language of Mr. Justice Jackson in his concurring opinion, 336 U.S. at page 455, 69 S.Ct. at page 724: "I suppose no person planning a crime would accept as a collaborator one on whom he thought he could not rely for help if he were caught, but I doubt that this fact warrants an inference of conspiracy for that purpose. *Of course, if* *an understanding for continuous aid had been proven, it would be embraced in the conspiracy by evidence and there would be no need to imply such an agreement. Only where there is no convincing evidence of such an understanding is there need for one to be implied."* (Emphasis supplied.)

conspiracy cases, as well as extend indefinitely the time within which hearsay declarations will bind co-conspirators." It met the Government's efforts to distinguish the Krulewitch and Lutwak cases as involving only *implied* conspiracies to conceal, whereas the Grunewald conspiracy was said to be an actual one, by saying: "True, in both Krulewitch and Lutwak there is language in the opinions stressing the fact that only an implied agreement to conceal was relied on. Yet when we look to the facts of the present cases, we see that the evidence from which the Government here asks us to deduce an 'actual' agreement to conceal reveals nothing beyond that adduced in prior cases. * * * We find in all this nothing more than what was involved in Krulewitch, that is, (1) a criminal conspiracy which is carried out in secrecy; (2) a continuation of the secrecy after the accomplishment of the crime; and (3) desperate attempts to cover up after the crime begins to come to light; and so we cannot agree that this case does not fall within the ban of those prior opinions. In effect, the differentiation pressed upon us by the Government is one of words rather than of substance. In Krulewitch it was urged that a continuing agreement to conceal should be implied out of the mere fact of conspiracy, and that acts of concealment should be taken as overt acts in furtherance of that implied agreement to conceal. Today the Government merely rearranges the argument. It states that the very same acts of concealment should be used as circumstantial evidence from which it can be inferred that there was from the beginning an 'actual' agreement to conceal. As we see it, the two arguments amount to the same thing: a conspiracy to conceal is being implied from elements which will be present in virtually every conspiracy case, that is, secrecy plus overt acts of concealment. There is not a shred of direct evidence in this record to show anything like an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission."

Thus it seems plain that the Supreme Court was developing from considerations of policy a rule which it deemed essential to prevent a wiping out of the statute of limitations altogether in conspiracy cases. In Krulewitch the Government only undertook to argue that in every case of conspiracy, from the very nature of things a conspiracy to conceal was present and implied. In Grunewald, with no more evidence, the Government elaborated its argument by saying that the secrecy and concealment employed shows, circumstantially, that the original agreement between the conspirators actually had, as one of its intended objectives the carrying out of concealment. The policy that blocked the theory stated in Krulewitch blocks this one also. Upon the authority of this decision of the Supreme Court we hold that it was error to permit this case to go to the jury.

The judgment is reversed and the cause remanded with directions to enter judgment for the appellant.